IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| COOK COUNTY REPUBLICAN PARTY and CHICAGO REPUBLICAN PARTY, )<br>)<br>) | |
| Plaintiffs, )<br>) | |
| v. ) | Case No. 16 C 6598 |
| ) | |
| BOARD OF ELECTION COMMISSIONERS FOR THE CITY OF CHICAGO, et al., )<br>)<br>) | |
| Defendants. ) | |

**MEMORANDUM OPINION AND ORDER**

After the Cook County Republican Party and Chicago Republican Party (collectively the "GOP") filed this action seeking relief under 42 U.S.C. § 1983[1] for asserted violations of their First and Fourteenth Amendment rights, on July 12 this Court entered a Temporary Restraining Order ("TRO") enjoining the Board of Election Commissioners for the City of Chicago, Marisel Hernandez, William Kresse and Jonathan Swain (collectively "the Board") from conducting further hearings or issuing any decision in the Board's Proceeding No. 2016-EB-RES-01 (referred to as Sapone v. Leef) until further order of this Court. By agreement of the parties that order was later extended through August 9 in order to give all involved an opportunity to weigh in on the merits.

Because of the difficulty that might possibly be encountered in generating a full-blown opinion within that still-abbreviated timetable, this Court inquired of the litigants as to whether

---

[1] All citations to that section will take the form "Section --," omitting the prefatory "42 U.S.C."

the TRO could be extended further by agreement for a brief further period without hindering the Board's ability to complete the necessary procedures in advance of the November election (in that respect Board counsel had indicated that the latter part of August was the time required for the Board's determination as to the candidates to be listed on the ballot). After waffling without giving a direct response to this Court's repeated questions on that score, made in a good faith effort to devise a workable timetable for all involved, counsel for the Board represented that his client opposed any extension whatever -- irrespective of whether that extension interfered with the Board's normal work -- and flatly refused even a few days' relief.[2]

In any event, that lack of courtesy has not prevented this Court from giving full and thoughtful consideration to the question whether the motion by the GOP for a preliminary injunction should or should not be granted. This memorandum opinion and order is the product of that consideration.

**Background**

In March 2016 the GOP -- concerned about infiltration by what it believed could be "carpetbagging" candidates for ward committeeman posts who were in fact Democratic operatives -- added this provision (hereafter referred to as "Section 3") to its bylaws shortly before the March 15 primary election:

---

[2] In the absence of some demonstrated prejudice to a client's interests (and none has even seen hinted at here), Board counsel (and the Board itself) plainly fail to recognize that the denial of such a request for a brief extension -- like rejecting an opposing counsel's request for the courtesy of a brief extension of a due date, only more so -- is really a decision for the lawyer (who owes a responsibility to the judicial system as well as to his or her client) and not for the client to make. It might well be wondered whether what has just been recounted in the text reflects a political bias rather than the even-handedness incumbent on the Board in discharging its responsibilities. That possibility, however, has -- perhaps needless to say -- had no effect whatever on the decision reached here.

> Section 3: A vacancy shall exist in the office of Republican committeeman in any ward or township in which an elected or appointed committeeman votes, or has voted, in the primary for another political party in the previous 8 years.

At that primary election Frances Sapone ("Sapone") and Sammy Tenuta ("Tenuta") stood for election as the 29th and 36th ward committeeman respectively and -- unsurprisingly, for they ran unopposed -- received the most votes in their wards. But because Sapone and Tenuta had voted in the Democratic Party primary within the previous eight years, the Chairman of the Cook County Central Committee declared their seats vacant pursuant to Section 3.

At that same primary election no Republican candidate appeared on the ballot for the office of United States Representative for the 7th Congressional District. To fill such a vacancy, Illinois law (10 ILCS 5/7-61)[3] requires the political party involved, among other steps, to hold a meeting to nominate a candidate. So on April 13 Republican ward committeemen from election precincts within the 7th Congressional District held a nominating meeting at which they selected Jeffrey A. Leef ("Leef") as their nominee for Congress. But though the 29th and 36th wards were included within the 7th Congressional District, the GOP did not notify Sapone and Tenuta of the meeting because of the Section 3 declaration that they did not validly serve as committeemen.

That determination by the GOP prompted Sapone to file an objection to Leef's nomination on the ground that she and Tenuta were entitled to notice of the April 13 meeting.[4] After the initial hearing on that objection resulted in a recommendation by the hearing officer

---

[3] Further citations to the Illinois Election Code will take the form "Ill. Code § --," omitting the prefatory "10 ILCS 5/7-."

[4] It is undisputed that the Illinois election laws require notice to all actual committeemen.

that the Board exclude Leef from the ballot, the GOP filed this lawsuit and, shortly thereafter, filed a motion for preliminary injunctive relief. This opinion will now turn to the merits of that motion.[5]

## Standards for Preliminary Injunction

To resolve the merits of the GOP's motion, this Court must determine whether the entry of a preliminary injunction is appropriate at this early stage of the proceedings. This Court's exercise of its discretion to that end requires the GOP to satisfy each of the standards particularly well articulated in <u>Roland Mach. Co. v. Dresser Indus., Inc.</u>, 749 F.2d 380 (7th Cir. 1984) and applied consistently in the ensuing three decades:[6]

1. a likelihood of success on the merits;

2. the inadequacy of any remedy at law;

3. irreparable harm to the GOP if the preliminary injunction were to be denied;

4. the balancing of that harm if preliminary injunctive relief were wrongfully denied against the harm to the defendants if such preliminary relief were wrongfully granted; and

5. the absence of disservice to the public interest if the preliminary injunction is granted.

This opinion addresses those standards in turn.

---

[5] Memoranda filed by the parties are cited "Mem. --," "Resp. Mem. --" or "Reply Mem. --," with prefixes of "G.," "B." and "S." for the GOP, the Board and the Sapone-Tenuta duo respectively. Pinpoint citations to the Sapone-Tenuta unpaginated Resp. Mem. will refer to that memorandum's relevant section rather than to its page number.

[6] Though our Court of Appeals has had frequent occasion to reconfirm and apply the preliminary injunction criteria in numerous cases since <u>Roland</u>, this Court continues to regard the exposition in that case as the best explanation of those criteria and their rationale.

## Likelihood of Success: GOP's First Amendment and Due Process Rights

To state a claim for relief under Section 1983, the GOP must show (1) misconduct that "was committed by a person acting under the color of state law" and (2) that as a result of that misconduct it was deprived of "a right secured by the Constitution and laws of the United States" (West v. Atkins, 487 U.S. 42, 48 (1988)). Here the GOP has asserted violations of its First and Fourteenth Amendments right to freedom of association and its Fourteenth Amendment right to due process. As there is no dispute that the Board acted under color of state law, this opinion will turn to the GOP's likelihood of success in proving that the Board's hearing of Sapone's objection would violate the party's constitutional rights and that such violation would override any asserted countervailing considerations.

## First Amendment[7]

It has been well settled for decades that the First Amendment protects the rights of political parties to select their leaders freely. As explained by Eu v. San Francisco County Democratic Cent. Comm., 489 U.S. 214, 229 (1989) (with internal citations and quotation marks omitted):

> As we noted in Tashjian, a political party's determination of the structure which best allows it to pursue its political goals, is protected by the Constitution. Freedom of association also encompasses a political party's decisions about the identity of, and the process for electing, its leaders.

In invalidating California's challenged election laws, Eu, id. at 230 went on to hold:

> And by specifying who shall be the members of the parties' official governing bodies, California interferes with the parties' choice of leaders.

---

[7] This opinion adheres to the conventional and convenient (though technically imprecise) practice of referring to the underlying Bill of Rights provision (which of course imposes direct limitations only on the federal government) rather than solely to the Fourteenth Amendment (which applies to state actors and has been construed to embody such Bill of Rights guarantees).

Governmental interference is particularly problematic when it involves a political party's right to choose its nominees for elected office. As explained in California Democratic Party v. Jones, 530 U.S. 567, 575 (2000) (with internal citations omitted):

> In no area is the political association's right to exclude more important than in the process of selecting its nominee. That process often determines the party's positions on significant public policy issues, and even when those positions are predetermined it is the nominee who is the party's ambassador to the general electorate in winning it over to the party's views.
>
> *     *     *
>
> Unsurprisingly, our cases vigorously affirm the special place the First Amendment reserves for, and the special protection it accords, the process by which a political party selects a standard bearer who best represents the party's ideologies and preferences. The moment of choosing the party's nominee, we have said, is the crucial juncture at which the appeal to common principles may be translated into concerted action, and hence to political power in the community.

In this case, to ignore Section 3 and exclude Leef from the November ballot would strike at the GOP's associational rights on at least two levels. First, it would deprive the GOP of its constitutionally conferred ability to determine, through its committeeman eligibility criteria, "the structure which best allows it to pursue its political goals" (Eu, 489 U.S. at 229). And second, it would deprive the GOP of its right to choose a nominee to stand for election in the 7th Congressional District -- a right accorded "special protection" (California Democratic Party, 530 U.S. at 575). Thus it is crystal clear that disregarding Section 3 would burden the GOP's core associational rights under the First Amendment.

With the GOP's First Amendment deprivations thus having been firmly established, the next step is to determine whether the Board has some compelling interest in recognizing Sapone

and Tenuta as valid committeemen (and thus in hearing Sapone's objection) in spite of Section 3. On that score Eu, 489 U.S. at 231 (with internal citations omitted) explains:

> Because the challenged laws burden the associational rights of political parties and their members, the question is whether they serve a compelling state interest. A State indisputably has a compelling interest in preserving the integrity of its election process. Toward that end, a State may enact laws that interfere with a party's internal affairs when necessary to ensure that elections are fair and honest.

Here the only state law at issue is found at Ill. Code § 8(b), which provides that ward committeemen are to be elected by primary voters. And the GOP does not seek to challenge that law facially, but rather contends that the Board's attempted application of the law without regard to Section 3 violates the GOP's constitutionally confirmed associational rights. Hence this opinion will now turn to whether the Board has demonstrated a compelling interest in applying the Ill. Code as it has sought to do.

On that score B. Resp. Mem. 15 identifies one interest that the Board deems compelling:

> The law advances the State's interest in limiting opportunities for fraud and corruption by preventing party leadership from controlling nominating decisions, while promoting democratic decision-making by giving ultimate authority to party voters.

But the Board provides no predicate whatever for the notion that allowing the GOP to determine eligibility criteria for its own party committee could lead to fraud and corruption. To the contrary, the GOP added Section 3 for the specific (and entirely reasonable) purpose of <u>preventing</u> what it considered to be malicious interference by individuals who could be described as donkeys in elephants' clothing. So the Board's first purported compelling interest is readily rejected.[8]

---

[8] S. Resp. Mem. Argument I points out that under a 2015 amendment to 10 ILCS 5/14-3.1 (P.A. 98-1171) ward committeemen are now responsible for submitting a list of

(continued)

Similarly unsuccessful is the Board's second attempt at identifying a compelling interest, found at B. Resp. Mem. 18-19:

> Illinois' interest in protecting the fundamental rights of voters in democratically choosing their party leaders at primary elections conducted by the State and ensuring those decisions are not arbitrarily set aside by party executives is certainly compelling.

But in an unpersuasive effort to support that notion the Board cites only one Illinois case, Tully v. Edgar, 171 Ill. 2d 297, 664 N.E.2d 43 (1996). Tully involved a challenge to a state law that replaced the elected trustees of the University of Illinois with political appointees before the end of their six-year terms. In invalidating that law Tully, id. at 310, 664 N.E.2d at 50 (with internal citations and quotation marks omitted) explained:

> The citizens of this state elected the trustees to represent their interests in connection with the governance of a university which educates a significant number of this state's youth. Like the local school council at issue in Fumarolo, the trustees perform functions which are at the heart of a traditional and vital governmental function: the operation of public education. The trustees, whose election the State has opened to all qualified voters, are government officials in every relevant sense of that term. Accordingly, we reject the appellants' claim that the votes cast for trustees are not entitled to constitutional protection because the trustees do not serve an important representative capacity.

_____
(footnote continued)

proposed election judges to the Board, from which list the Board makes the ultimate selection. As the Sapone-Tenuta duo view it, that responsibility assertedly gives the state a compelling interest in protecting fair elections by controlling how ward committeemen are chosen. But that is really an impermissible stretch. No valid reason has been identified for the proposition that state control over the committeeman selection process would further the state's interest in fair elections. Indeed, to allow "carpetbagging" Democratic operatives as well as acknowledged Democratic committeemen to propose all election judges could well operate to compromise election fairness. Thus the Sapone-Tenuta attempt to identify a compelling state interest by pointing to the ward committee's role in proposing election judges must also fail.

- 8 -

But in Illinois ward committeemen are <u>not</u> government officials. As reconfirmed in <u>McCaster v. Greenwood</u>, 328 Ill. App. 3d 643, 646, 766 N.E.2d 666, 669 (5th Dist. 2002) (with internal citations omitted and emphasis added):

> In a primary election, a candidate vies for the nomination as his party's candidate for an elective public office. Contests for party offices, including a party's precinct, township, ward, and central committeemen, are also decided in primary elections. A person elected to a public office is endowed with some functions of the sovereignty of a state or a political subdivision thereof. **In contrast, a person elected to a party office represents only members of the respective political party to which he belongs, and he is accountable only to that party. A committeeman is not a public officer.**

That holding torpedoes the Board's asserted interest in protecting voters' say in choosing ward committeemen, who have expressly been held accountable not to the public but to their party. And by emphasizing that ward committees are partisan rather than public in nature, <u>McCaster</u> in fact fortifies the GOP's position that it possesses a First Amendment right to set criteria for election to those committees.[9]

---

[9] B. Resp. Mem. 15-16 cites and quotes <u>Kluk v. Lang</u>, 125 Ill. 2d 306, 331, 531 N.E.2d 790, 801 (1988) for the notion that party committees should in fact be treated as public agencies. But <u>Kluk</u> involved a statute that delegated to party committees the selection of appointees to fill legislative vacancies. That statute was challenged on the ground that it involved an unconstitutional delegation of sovereign power to a private entity. Upholding the statute, <u>Kluk</u>, <u>id</u>. observed:

> And though political party committees may be private entities in many contexts, the extensive responsibility given them by the Election Code in connection with appointments to legislative vacancies, pursuant to a constitutional mandate to preserve the political party affiliation of the former incumbent as to the successor legislator, takes them [beyond their private status].

That however is really the exception that proves the rule, for the problem posed by this case is not one of vesting a public function in a private body, but rather one of depriving that body of its right to choose <u>its</u> <u>own</u> <u>leaders</u>. Indeed, the private and partisan nature of party committees was the very basis for the challenge in <u>Kluk</u>.

In its final attempt to identify a compelling interest, B. Resp. Mem. 20 contends that disqualifying Tenuta and Sapone would disenfranchise voters in the 29th and 36th wards who were not represented at the meeting where Leef was chosen. But even apart from whether that lack of representation poses any real problem (which has not been shown ) -- and even setting aside the fact that to remove Leef from the ballot would (by the Board's logic -- or lack of it) "disenfranchise" voters in every other ward contained within the 7th Congressional District -- that issue is really a red herring. Before this Court the question is rather whether the Board must recognize the 29th and 36th ward offices as vacant pursuant to Section 3, and that has been confirmed beyond peradventure. What effect if any those vacancies would have on the validity of Leef's nomination was not raised in Sapone's objection, is not before this Court and cannot be invoked by the Board as a post-hoc basis to disregard Section 3.

In sum, the Board has failed utterly to identify any logical compelling justification for its burdening of the GOP's First Amendment rights. It is an understatement to say that the GOP is highly likely -- in fact it is certain -- to prevail on its claim under that Amendment.

**Due Process**

It is also asserted by the GOP that a Board hearing on Sapone's objections would deprive the party of its due process rights under the Fourteenth Amendment. As explained in Mathews v. Eldridge, 424 U.S. 319, 332 (1976):

> Procedural due process imposes constraints on governmental decisions which deprive individuals of "liberty" or "property" interests within the meaning of the Due Process Clause of the Fifth or Fourteenth Amendment.

To evaluate due process claims Mathews, id. at 335 sets out a trifold set of factors to be considered:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

As to the nature of those procedural safeguards, <u>Cleveland Bd. of Educ. v. Loudermill</u>, 470 U.S. 532, 542 (1985) (with internal quotation marks omitted) reconfirmed many years ago:

> An essential principle of due process is that a deprivation of life, liberty, or property be preceded by notice and opportunity for hearing appropriate to the nature of the case.

Here it has already been established that the Sapone objection proceeding imperils the GOP's First Amendment rights, so that the question becomes whether the GOP is afforded adequate opportunity to defend those rights. On that score there is no dispute that the GOP is not a party to the <u>Sapone v. Leef</u> proceeding, which strongly suggests that its due process concerns are well founded.

By way of an attempted response to those concerns, the Board advances a number of frankly misleading defenses of its own procedures. First, B. Resp. Mem. 7 suggests that the GOP could seek to intervene in the <u>Sapone v. Leef</u> proceeding <u>at the Board's discretion</u> -- but of course even if that is so, there is no assurance that such a request would be granted (and the Board's aggressive posture in this action to date raises serious doubts on that score). Moreover, the serious problem of timing -- which, it will be remembered, underpinned the Board's staunch resistance to this Court's request for an agreement to a few days' extension to the TRO -- makes any realistic prospect of gaining relief through intervention totally illusory.

But the problem here goes even deeper, for even if the Board <u>did</u> allow the GOP to intervene there is no question that it lacks jurisdiction to adjudicate the GOP's constitutional

claims.  To that point B. Resp. Mem. 8 says that a party to the proceeding may appeal to the Circuit Court -- but that claimed response is really bogus, for it ignores (or omits) (1) the fact that the GOP is <u>not</u> a party to the proceeding as well as (2) the time problem referred to in the preceding paragraph.

Finally as to any claimed burden on the governmental party, B. Resp. Mem. 6-7 stresses the numerous deadlines confronting the Board before the November election -- but it provides no explanation as to how or why suspending (or eliminating) the <u>Sapone</u> hearing would interfere with its ability to comply with those deadlines (and as discussed earlier, this Court's effort to accommodate the Board's timetable was met with intransigence rather than cooperativeness).  In sum, the Board's responses to the GOP's due process claim are rejected in their entirety.  Thus the GOP has shown a strong likelihood of success on that claim if it were needed to buttress its fully established First Amendment claim.[10]

---

[10] B. Resp. Mem. 7 also submits that the GOP's constitutional rights are protected by Leef's participation in the objection proceeding.  But even setting aside the fact that the Board lacks jurisdiction to hear constitutional claims, the GOP's premise is completely off base:  Leef's interest in serving as the GOP nominee is wholly distinct from the GOP's established associational rights under the First Amendment.  Also susceptible to summary rejection is S. Resp. Mem. Argument II's contention that the GOP could have devised elaborate procedures to exclude Sapone and Tenuta from the nominee selection process without excluding them from the ward committee.  That misses the mark entirely:  Forcing the GOP to manipulate its internal procedures in order to evade state interference collides head-on with the clear teaching of <u>Eu</u>, 489 U.S. at 229:

> Freedom of association also encompasses a political party's decisions about the identity of, and the process for electing, its leaders.

Thus Sapone and Tenuta fare no better than the Board in their assault on the GOP's First Amendment rights.

**Inadequacy of Remedy at Law**

Roland, 749 F.2d at 383 and 386 made the perceptive point that the absence of an adequate remedy at law and irreparability of harm are separate factors entering into the granting or denial of preliminary injunctive relief, though there are circumstances in which the two requirements merge (as Roland, id. at 386 explains, a lawsuit in which the sole remedy sought at trial is an award of damages presents the obvious merger situation). Here the action is one in which the ultimate as well as the preliminary relief sought is injunctive in nature, so that the inadequacy of a remedy at law is at the lawsuit's core.

And that inadequacy could hardly be more clear, for if the Board goes forward with its hearing while recognizing Sapone as the 29th Ward Committeeman, the GOP will have been deprived of its right to select its leaders and field a Republican nominee for the 7th Congressional District. Given the California Democratic Party holding that the right to choose a nominee is accorded "special protection" by the First Amendment (530 U.S. at 575), the GOP's need for injunctive relief is clear.[11]

**Irreparable Harm**

As for the irreparability-of-harm requirement, Roland, 749 F.2d at 386 teaches:

> The requirement of irreparable harm is needed to take care of the case where although the ultimate relief that the plaintiff is seeking is equitable, implying that he has no adequate remedy at law, he can easily wait till the end of trial to get that relief.

---

[11] On that issue B. Resp. Mem. 5-8 understandably merges the Board's due process arguments with its remedy-at-law arguments. But those arguments fail here for the same reasons they failed as to the Fourteenth Amendment.

That is really a slam dunk for the GOP: If Sapone is recognized as a committeeman and her objection is sustained, Leef will be excluded from the ballot in November. That situation plainly cries out for prompt relief.

### Balancing of Harms

With the irreparability of harm to the GOP if its motion for preliminary injunction were to be wrongfully denied having been firmly established, the balancing process required by Roland, 749 F.2d at 387 calls for a comparative evaluation of the burden that would be borne by the Board should the GOP's motion be wrongfully granted. On that score the Board has put forward no argument whatever as to what harm or harms it could face if the GOP's motion is granted. As such, the "sliding scale" described in Roland, id. at 387-88 dips with extraordinary heaviness in the GOP's favor -- the balance of harms weighs overwhelmingly in favor of granting the GOP's proposed injunctive relief.

### Public Interest

This Court's final inquiry is whether granting the preliminary injunction would result in any disservice to the public interest, a factor that Roland, 749 F.3d at 388 explained for the first time is not merely a caboose on the train leading to possible preliminary injunctive relief but instead calls for consideration of whether others who are not before the court would suffer consequences from the granting of such interim relief. No such disservice has been specifically identified by the Board, while on the other side of the coin Republican voters in the 7th Congressional District (nonparties in this case) would be deprived of any opportunity to vote for a congressional candidate from their own party -- a person who would be excluded from the ballot in November.

Any fair reading of the "public interest" concept leads to the conclusion that competitive elections in which each party can select its own leaders, and ultimately its own nominees, serves the public interest. Thus the GOP has satisfied the fifth and final condition precedent to the entry of preliminary relief.

### **Conclusion**

For the reasons stated in this opinion, it is hereby ordered that:

1. Defendants -- the Board of Election Commissioners for the City of Chicago, Marisel Hernandez, William Kresse and Jonathan Swain -- are hereby enjoined and restrained from conducting further hearings or issuing any decision in the Board's Proceeding No. 2016-EB-RES-01 (commonly known as <u>Sapone v. Leef</u>) until further order of this Court.[12]

2. No bond is required to be posted by plaintiffs.

_____
Milton I. Shadur
Senior United States District Judge

Date: August 2, 2016

---

[12] Because the Board has not had the opportunity to weigh in on the broader relief sought at G. Reply Mem. 12-13, and because a ruling on those added issues is not necessary to decide the preliminary injunction questions that have been decided here, this opinion has eschewed consideration of those matters. That said, it is recognized as a practical matter that the relief ordered here will result in Leef's inclusion on the ballot absent other action by the Board to frustrate that outcome. And in that respect it can only be hoped that the sense of a possible lack of neutrality on the Board's part suggested by some of its conduct and the stances taken in this litigation will not lead to a further confrontation here.