IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| COOK COUNTY REPUBLICAN PARTY and CHICAGO REPUBLICAN PARTY,<br><br>      Plaintiffs,<br><br>      v.<br><br>BOARD OF ELECTION COMMISSIONERS FOR THE CITY OF CHICAGO, et al.,<br><br>      Defendants. | Case No. 16 C 6598 |

## MEMORANDUM OPINION AND ORDER

Cook County Republican Party and Chicago Republican Party (collectively the "GOP") filed this action under 42 U.S.C. § 1983 ("Section 1983"), charging asserted violations of their First and Fourteenth Amendment rights. Both the GOP and two of the defendants, Frances Sapone ("Sapone") and Sammy Tenuta ("Tenuta"), have filed cross-motions for summary judgment seeking declaration of their respective rights and legal relations pursuant to 28 U.S.C. § 2201 ("Section 2201," the federal Declaratory Judgment Act). As for the remaining defendants, the Board of Election Commissioners for the City of Chicago, Marisel Hernandez, William Kresse and Jonathan Swain (collectively "the Board"), they have opted not to weigh in on the current cross-motions -- but because this opinion pronounces a final judgment in the case, they are bound by its terms as well.

### Summary Judgment Standards

Every Rule 56 movant bears the burden of establishing the absence of any genuine issue of material fact (Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986)). For that purpose courts

consider the evidentiary record in the light most favorable to nonmovants and draw all reasonable inferences in their favor (Lesch v. Crown Cork & Seal Co., 282 F.3d 467, 471 (7th Cir. 2002)). Courts "may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts" in resolving motions for summary judgment (Payne v. Pauley, 337 F.3d 767, 770 (7th Cir. 2003)). But a nonmovant must produce more than "a mere scintilla of evidence" to support the position that a genuine issue of material fact exists (Wheeler v. Lawson, 539 F.3d 629, 634 (7th Cir. 2008)) and "must come forward with specific facts demonstrating that there is a genuine issue for trial" (id.). Ultimately summary judgment is warranted only if a reasonable jury could not return a verdict for the nonmovant (Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).

One more complexity could be added where, as here, cross-motions for summary judgment are presented. Under the same principles as stated in the preceding paragraph, this Court must adopt a dual perspective that it has often referred to as Janus-like: As to each motion the nonmovant's version of any disputed facts would have to be credited, and that could on occasion lead to the denial of both motions. Fortunately that is not a risk here, because all relevant facts are undisputed.

**Background**

In March 2016 the GOP -- concerned about infiltration by what it believed could be "carpetbagging" candidates for ward committeeman posts who were in fact Democratic operatives -- added this provision (hereafter "Section 3") to its bylaws shortly before the March 15 primary election:

> Section 3: A vacancy shall exist in the office of Republican committeeman in any ward or township in which an elected or appointed committeeman votes, or has

voted, in the primary for another political party in the previous 8 years.

At that primary election Sapone and Tenuta stood for election as the Republican 29th and 36th ward committeemen respectively and -- unsurprisingly, for they ran unopposed -- received the most votes in their wards. But because both Sapone and Tenuta had voted in Democratic Party primaries within the previous eight years, the Chairman of the Cook County Republican Central Committee declared those Republican committeeman offices vacant pursuant to Section 3.

At that same primary election no Republican candidate appeared on the ballot for the office of United States Representative for the 7th Congressional District. For such a vacancy to be filled, Illinois law (10 ILCS 5/7-61)[1] requires the political party involved, among other steps, to hold a meeting to nominate a candidate. So on April 13 Republican ward committeemen from election precincts within the 7th Congressional District held a nominating meeting at which they selected Jeffrey A. Leef ("Leef") as their nominee for Congress. Though the 29th and 36th wards were included within the 7th Congressional District, the GOP did not notify Sapone and Tenuta of the meeting because of the Section 3 declaration that they did not validly serve as committeemen.

That determination by the GOP prompted Sapone to file an objection to Leef's nomination on the ground that she and Tenuta were entitled to notice of the April 13 meeting.[2] This action was filed by the GOP after the initial hearing on that objection resulted in a recommendation by the hearing officer that the Board exclude Leef from the ballot. On July 12 this Court entered a temporary restraining order ("TRO") enjoining the Board from conducting

---

[1] Further citations to that statute (referred to in this opinion as the "Election Code") will take the form "Code § --," omitting the prefatory "10 ILCS 5/7-."

[2] It is undisputed that the Illinois election laws require notice to all actual committeemen.

further hearings or issuing any decision in the Board's Proceeding No. 2016-EB-RES-01 (referred to as <u>Sapone v. Leef</u>) until further order of this Court. Shortly thereafter the GOP filed for a preliminary injunction, which this Court granted. Recognizing the need to resolve this matter in time to allow ballots to be printed for the upcoming November election, this Court requested that the parties file abridged motions for summary judgment. As stated at the outset, the active adversaries now seek summary judgment as to the GOP's Section 1983 claims and a declaration of their respective rights and legal relations pursuant to Section 2201.

## **Section 1983 Claims and the Declaratory Judgment Act**

To state a claim for relief under Section 1983, the GOP must show (1) misconduct that "was committed by a person acting under the color of state law" and (2) that as a result of that misconduct it was deprived of "a right secured by the Constitution and laws of the United States" (<u>West v. Atkins</u>, 487 U.S. 42, 48 (1988)). As to the first required showing, there is no dispute that the Board acted under the color of state law. And as to the second, because the GOP contends that those actions compromised the party's First and Fourteenth Amendment rights, it seeks as a remedy an order permanently enjoining the Board from conducting hearings in <u>Sapone v. Leef</u> and a declaration of its rights pursuant to Section 2201:

> [A]ny court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such.

> On that score <u>Wilton v. Seven Falls Co.</u>, 515 U.S. 277, 286 (1995) teaches:

> Since its inception, the Declaratory Judgment Act has been understood to confer on federal courts unique and substantial discretion in deciding whether to declare the rights of litigants.

- 4 -

And as the seminal opinion in Aetna Life Ins. Co. of Hartford, Conn. v. Haworth, 300 U.S. 227, 240-41 (1937) put it:

> The controversy must be definite and concrete, touching the legal relations of parties having adverse legal interests.

**First Amendment Rights**

It is well settled that the First Amendment's freedom of association guaranty protects the rights of political parties to select their leaders freely. As Eu v. San Francisco County Democratic Cent. Comm., 489 U.S. 214, 229-30 (1989) (internal citations and quotation marks omitted) has explained:

> As we noted in Tashjian [v. Republican Party of Conn., 479 U.S. 208, 224 (1986)], a political party's determination of the structure which best allows it to pursue its political goals, is protected by the Constitution. Freedom of association also encompasses a political party's decisions about the identity of, and the process for electing, its leaders.

To that end courts carefully constrain governmental interference with a party's business of choosing its members and leaders. Any such "heav[y] burden on a political party's associational freedom" is "unconstitutional unless it is narrowly tailored to serve a compelling state interest" (California Democratic Party v. Jones, 530 U.S. 567, 582 (2000)).

Sapone and Tenuta contend that invalidating Section 3 would impose a "lesser burden" on the GOP's associational rights and that such invalidation is constitutionally permissible if it serves a "correspondingly weighty" state interest (S. Mem. 6).[3] On that score they attempt to seek support from Timmons v. Twin Cities Area New Party, 520 U.S. 351 (1997), which upheld a Minnesota law banning "fusion candidates" (candidates who appear on multiple parties'

---

[3] Only one memoranda, that filed by the Sapone-Tenuta duo, is cited in this opinion. As the text reflects, it is cited "S. Mem. --."

ballots). In upholding the ban Timmons, id. at 363 reasoned that although the law may have prevented a particular individual from appearing on a particular ballot, it did not severely burden associational rights because it did not "restrict the ability of the New Party and its members to endorse, support, or vote for anyone they like" and was "silent on parties' internal structure, governance, and policymaking."

But Timmons itself torpedoes the Sapone-Tenuta attempted argument, for the bylaw in this case is precisely the type of regulation that Timmons identifies as more burdensome than the one at issue in that case. Wholly unlike the law at issue in Timmons, Section 3 pertains directly to "internal structure, governance, and policymaking" by specifying the minimum level of party affiliation required of those seeking party leadership positions. And under appropriate circumstances (such as those surrounding the nomination of Leef for Congress at a meeting of those party leaders), it is used to further the party's right to "endorse, support, or vote for anyone they like."

In that respect California Democratic Party, 530 U.S. at 575 further emphasized that "In no area is the political association's right to exclude more important than in the process of selecting its nominee." Section 3 was enacted to effectuate the GOP's right to exclude from leadership positions persons whom it quite understandably does not consider to be genuine members of its party, an exclusion that in turn adds a layer of control over the types of party affiliates involved in selecting its nominee for Congress. Such activity clearly fits into the category of functions that the Supreme Court identified as protected by the First Amendment in Timmons and California Democratic Party.

In another effort to prop up their untenable position with a weak reed (which an examination proves to be no supportive reed at all), Sapone and Tenuta argue that state

interference with Section 3 is a "lesser burden" because Illinois law already allows the GOP to create nominating subcommittees that exclude ward committeemen who have voted in the primaries of different parties (S. Mem. 11). But that contention is also self-defeating, for it seeks to compel the GOP to achieve by indirection a self-regulating goal that it has elected to accomplish in a straightforward way. Here the GOP has chosen to enact a bylaw that automatically excludes certain individuals from ward committeeman positions, rather than going through the effort to exclude those individuals from the nominating process each and every time it becomes necessary. In sum, potential state interference with Section 3 does not qualify as a "lesser burden," and this opinion will therefore examine it under a lens of strict scrutiny.[4]

Having thus established that interfering with the GOP's application of Section 3 would severely burden the party's First Amendment rights, this opinion turns to the question whether Sapone and Tenuta have identified a compelling countervailing governmental interest. In that regard Sapone and Tenuta proffer the position that such total interference -- the argued-for invalidation of Section 3 -- would serve a compelling state interest because ward committeemen perform the important public functions of nominating election judges and filling vacancies in the Illinois General Assembly.

First, Sapone and Tenuta claim that the United States Constitution's Art. I, § 4 (the "Elections Clause") affords states the authority to regulate the selection of election judges, which in turn gives them the authority to regulate the selection of political party leaders who play a role

---

[4] It must however be stressed, as more than amply demonstrated by the extended analysis of and comparison between the respective arguments offered up by the adversaries here (an analysis and comparison engaged in both up to this point and hereafter in this opinion), that this is not a close case at all -- that the GOP would prevail by a wide margin under any standard of proof.

in the judges' selection. It is true that the Elections Clause delegates broad authority to the states to regulate their own elections ("The times, places, and manner of holding elections for Senators and Representatives, shall be prescribed in each state by the legislature thereof . . ."). As a threshold matter, however, in Tashjian, 479 U.S. at 217 the Supreme Court flatly rejected the proposition that the Elections Clause allows states to meddle in private political parties, for "[t]he power to regulate the time, place, and manner of elections does not justify, without more, the abridgment of fundamental rights, such as the right to vote, or, as here, the freedom of political association."

With that proposed overreading of the Elections Clause having been dispatched, analysis turns to the question whether Sapone and Tenuta have provided "more" that can justify state interference with the GOP's First Amendment entitlement to freedom of association. Sapone and Tenuta state correctly that election judges are integral to maintaining the integrity of elections in Illinois (S. Mem. 13). Pursuant to Code §§ 14-3.1 and 14-3.2, Illinois election judges are selected by local boards of elections from certified lists of individuals furnished by the county chairman or ward committeemen of the two leading political parties. Illinois certainly has authority to prescribe statutorily the role of ward committeemen of political parties in selecting election judges. What the state does <u>not</u> have, however, is the statutory authority to prescribe -- a subject about which the Election Code is silent -- limits on the qualifications that a political party may require of its ward committeemen.

Ward committeemen also play a role in filling vacancies in the General Assembly, a role that Sapone and Tenuta contend confers their entitlement to interfere in order to serve what they view as a compelling state interest. In that respect Kluk v. Lang, 125 Ill. 2d 306, 326, 531 N.E.2d 790, 799 (1988) has recognized that the statutory role "arguably confer[s] indicia of

public agency" on political party committees. But <u>Kluk</u>, <u>id.</u> at 331, 531 N.E.2d at 801 (emphasis added) expressly distinguished the special status conferred by statute on such committees when they are carrying out their appointment duties from that of political parties when they are performing <u>their</u> regular functions:

> And though political party committees may be private entities in many contexts, the extensive responsibility given them by the Election Code in connection with appointments to legislative vacancies, pursuant to a constitutional mandate to preserve the political party affiliation of the former incumbent as to the successor legislator, takes them at least as far from private status as was [another commission in an earlier Illinois Supreme Court case] . . . In addition, the Election Code elsewhere clearly implies that the party committees <u>in their appointment capacity</u> are to be considered public agencies.

Indeed, the unique appointment duties discussed in <u>Kluk</u> are clearly an exception that proves the rule. Twelve years before <u>Kluk</u> was decided, <u>People ex rel. Rudman v. Rini</u>, 64 Ill. 2d 321, 356 N.E. 2d 4 (1976) invalidated a different statute that transferred the power to appoint individuals to fill vacancies in county offices and county board seats to political parties precisely because "the State's sovereign power to appoint public officers could not be conferred upon private persons or groups" (<u>Kluk</u>, 125 Ill.2d at 325, 531 N.E.2d at 798). But in upholding the law dealt with in <u>Kluk</u>, the Illinois Supreme Court found it necessary there to distinguish the <u>Rudman</u> decision at great length -- and to do so in a way that made obvious the parallelism between this case and <u>Rudman</u>, <u>not</u> this case and <u>Kluk</u>.

In particular it should be emphasized that <u>Kluk</u>, 125 Ill. 2d at 326, 531 N.E.2d at 799 (emphasis added) relied on the procedures set forth in the appointment statute that imposed extra accountability on parties during the appointment process and "indicia of public agency <u>when they are performing their duties under the statute</u>." <u>Kluk </u>clearly limited the "public agency" character of political parties to those special instances when the parties are fulfilling their

statutorily-imposed duties to appoint members of the General Assembly. By sharp contrast, the functions of organizing and nominating candidates that are at issue in this case are inherently internal responsibilities of a political party. Thus the nomination of Leef as the party's "standard bearer" candidate for Congress is a quintessential function of the GOP as a private political party, a function that plainly does not confer any "indicia of public agency" and just as plainly does not abrogate associational protections provided by the First Amendment.

When push comes to shove, defendants' arguments are reduced to the impermissible position that because political parties perform a number of important functions in Illinois, the state should have broader authority to regulate their internal workings than the United States Constitution allows. But the purported "compelling state interests" advanced by Sapone and Tenuta -- the recommendation of election judges and the authority to fill vacancies in the General Assembly by appointment -- involve functions and duties that are no better than tangential to the party's essential inner workings. Although the state may be enabled to regulate the manner in which political parties perform the external functions referred to by Sapone and Tenuta, those functions are not at issue in this case. Instead, when it comes to the matters at issue here -- particularly the qualifications that the parties set for internal leadership and the manner in which parties select their nominees -- the Supreme Court has made it very clear in <u>California Democratic Party</u>, 530 U.S. at 572-73 (internal citations and quotation marks omitted) that the First Amendment overrides any potential state interference:

> We have recognized, of course, that States have a major role to play in structuring and monitoring the election process, including primaries. We have considered it too plain for argument, for example, that a State may require parties to use the primary format for selecting their nominees, in order to assure that intraparty competition is resolved in a democratic fashion.

\* \* \*

> What we have not held, however, is that the process by which political parties
> select their nominees are, as respondents would have it, wholly public affairs that
> States may regulate freely. To the contrary, we have continually stressed that
> when States regulate parties' internal processes they must act within limits
> imposed by the Constitution.

### **Illinois Law**

With all of that said, though, in the interest of completeness this opinion goes on to treat with the Sapone-Tenuta contention that the enforcement of Section 3 somehow violates the Election Code, which states that ward committeemen "shall continue as such committeemen until the date of the primary to be held in the second year after their election" (Code § 8(b)) and sets forth conditions for vacancies of ward committeemen that include conviction of a felony (Code § 8(k)) or death, resignation or ceasing to reside within the ward (Code § 8-5).[5] But none of those provisions or anything else in Illinois law prohibits the rights of political parties to establish additional conditions under which the position of committeeman becomes vacant, as the GOP has done here by applying Section 3 to vacate the positions claimed by Sapone and Tenuta.

Nor do state laws concerning "party-switching" somehow render the GOP's bylaw invalid or unenforceable. On that score Sapone and Tenuta point to two Illinois Supreme Court opinions that uphold the General Assembly's authority to regulate party-switching time limits and to interpret the state law related to those limits, but neither of those opinions is persuasive on the issue posed by this case.

---

[5] Lest the ensuing text discussion be misunderstood, however, it must be recognized that the legal effect of what has gone before is that even if that contention were to merit an affirmative answer, that reading of the Election Code would have to give way to the already-ruled-upon supremacy of the GOP's federal constitutional rights. In that sense this Illinois Law section of this opinion might well be viewed as unnecessary surplusage.

First, <u>Sperling v. County Officers Electoral Bd</u>., 57 Ill. 2d 81, 86, 309 N.E.2d 589, 591-92 (1974) held that two-year party switching restrictions for <u>voters</u> were unconstitutional, while it and merely affirmed en route that the legislature may impose such restrictions on political candidates. Importantly, <u>Sperling</u> does not in any way limit the party-switching regulation of nominees and party leadership as the business of the legislature alone. Moreover, this dictum in <u>Sperling</u>, <u>id.</u> at 86, 309 N.E.2d at 591 also supports the spirit of the GOP's position on its right to regulate party-switching of the type practiced by Sapone and Tenuta:

> We believe that standards governing party changes by candidates may and should be more restrictive than those relating to voters generally.

Second, <u>Hossfield v. Illinois State Bd. of Elections</u>, 238 Ill. 2d 418, 428-29, 939 N.E.2d 368, 374-75 (2010) likewise offers Sapone and Tenuta no help. That case upheld a state senator's right to submit nomination papers as a voting Republican when six months earlier he had voted on a Democratic ballot -- a ruling based on the fact that the no-switch rule had been eliminated from the Election Code and no other regulations existed to prohibit his actions. In so ruling the Illinois Supreme Court lamented (<u>Hossfeld</u>, <u>id.</u> at 429-30, 939 N.E.2d at 375 (quoting <u>Sperling</u>)):

> Though we agree with Hossfield that party-switching restrictions on candidates for public office are an important protection in the electoral process, "[s]uch restrictions and establishment of the periods of time involved are, within constitutional limitations, matters for legislative determination."

Just so, this Court is not at liberty here to dictate or second guess the internal party-switching bylaws of the GOP, because doing so would violate the First Amendment.

Finally, the Sapone-Tenuta contention that Section 3 unconstitutionally deprived citizens who voted for Sapone and Tenuta of the right to vote does not ring the bell either,[6] for the holding in Tully v. Edgar, 171 Ill. 2d 297, 305-06, 664 N.E.2d 43, 48-50 (1996), which Sapone and Tenuta cited in claimed support of their position, plainly does not prohibit the GOP's application of Section 3. Tully, id. at 305, 664 N.E.2d at 48 declared unconstitutional the application of a term limit statute to end the term of trustees for the University of Illinois retroactively, reasoning that it would "operate[ ] as a 'post-hoc' negation of the right to vote" because it would nullify the result of a valid election. Although there are similarities between the facts in Tully and in this case, two key differences exist.

For one thing (and importantly), Tully dealt with a state statute that impinged on the rights of state citizens to vote for occupants of public office, while here the regulation at issue is the internal bylaw of a private political party that dictates the qualifications of ward committeemen who are not government officials (a contrast held to be meaningful in McCaster v. Greenwood, 328 Ill. App. 3d 643, 646, 766 N.E.2d 666, 669 (5th Dist. 2002)). Second, this case concerns decisions by a private political party about governance completely internal to the organization, while by contrast Tully involved a restriction on the office of trustee of a public university, a subject of great importance to citizens of the state irrespective of their party affiliations.

In sum, even apart from the overriding impact of the First Amendment, Illinois state law does not justify invalidating Section 3 and in turn voiding Leef's nomination. None of the state

---

[6] Whether Sapone and Tenuta have standing to advance such an argument, based as it is on the claimed rights of others, is an interesting legal question on its own. This opinion will not, however, address that subject -- it is unnecessary to the result announced here on other grounds.

- 13 -

laws cited by Sapone and Tenuta bars the GOP from applying its Section 3 to vacate their positions as committeemen.

And at the risk of needless repetition, even were that not the case the United States Constitution's Supremacy Clause (its Art. VI, § 2) clearly dictates that state law cannot be applied in violation of the Constitution. Without question, the First Amendment vigorously protects political parties' freedom of association -- a freedom that encompasses their ability to choose their members and their leaders (Eu, 489 U.S. at 229) and to select their own standard bearer, rights for which the First Amendment reserves a "special place" and accords "special protection" (California Democratic Party, 530 U.S. at 575).

For the reasons set forth in this opinion, to apply Illinois law to invalidate the Section 3 bylaw, which would in turn retain for Sapone and Tenuta their invalidly-obtained positions as ward committeemen, would violate the First Amendment's freedom of association clause. Although that decision obviates the need to address the Fourteenth Amendment's Due Process Clause, a few words on that subject will be added.

## Due Process

This Court's August 2, 2016 memorandum opinion and order (Dkt. No. 47) held that the GOP had shown a strong likelihood of success on its due process claim against the Board. As stated at the outset of this opinion, the Board has opted for bystander status on the current cross-motions, and the issue was not addressed in the Sapone-Tenuta motion for summary judgment. Hence for the reasons set out in this Court's Dkt. No. 47 opinion, it reconfirms that further proceedings by the Board in the matter of Sapone v. Leef would violate the GOP's due process rights.

## **Conclusion**

This Court grants summary judgment in favor of the GOP on all its claims (Dkt. No. 58) and denies summary judgment to Sapone and Tenuta in all respects (Dkt. No. 60). In accordance with the Declaratory Judgment Act, this Court hereby declares:

1. Section 3 is valid, and compliance with Section 3 is a necessary qualification for seating and recognition as a Republican ward committeeman notwithstanding any provision of the Election Code.

2. Frances Sapone is not the Republican ward committeeman for the 29th Ward of Chicago by virtue of her disqualification for that office under Section 3.

3. Sammy Tenuta is not the Republican ward committeeman for the 36th Ward of Chicago by virtue of his disqualification for that office under Section 3

4. Defendants Chicago Board of Election Commissioners and Marisel Hernandez, William Kresse and Jonathan Swain, sitting as an electoral board, are permanently enjoined from conducting hearings in Sapone v. Leef, Proceeding No. 2016-EB-0.

This is a final judgment in this action.

_____
Milton I. Shadur
Senior United States District Judge

Date: September 14, 2016